UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RICHARD HIRSCH, Assignee of Certain Claims
of the Bankruptcy Estate of Franklin Industries,
LLC,

                    **MEMORANDUM AND ORDER**
                    12-CV-952 (RRM)

             Plaintiff,

      - against -

QINGDAO ORIEN COMMERCIAL
EQUIPMENT CO., LTD., f/k/a AUCMA, JOHN
DORAN, MICHAEL WITTHOFT, FIVE STAR
ENTERPRISES LIMITED, and ORIEN USA,
LLC,

             Defendants.
------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

On February 28, 2012, Richard Hirsch ("Hirsch") filed this complaint sounding in breach

of contract, breach of warranty, and theft of proprietary information. (Compl. (Doc. No. 1).)

This case concerns Franklin Industries, LLC ("Franklin"), a seller of refrigeration equipment and

non-party that entered bankruptcy in 2009. In 2011, Franklin's Chapter 7 trustee ostensibly

assigned to Hirsch certain causes of action upon which basis Hirsch brought this lawsuit.

Before the Court are the motions of defendant Qingdao Orien Commercial Equipment

Co, Ltd. ("Qingdao"),[1] (Doc. No. 40), as well as of defendants Orien USA, LLC ("Orien") and

John Doran ("Doran") ("the Doran defendants"), (Doc. No. 37), to dismiss the complaint

pursuant to, *inter alia*, Federal Rule of Civil Procedure ("Rule") 12(b)(1). In these dismissal

---

[1] References to "Qingdao" or "Quingdao" in this opinion are to the named company, not to the collective group of
entities referred to as "Quingdao" in the assignment instrument and related materials (which included any affiliates,
successors, predecessors, and assigns). Moreover, although the company's name is spelled "Quingdao" in the
assignment and related materials, it is spelled "Qingdao" in the complaint and everywhere else in this litigation.
Except when directly quoting from the assignment or related paperwork, the Court uses the latter spelling – which,
notably, is how Qingdao refers to itself in its own motion papers.

motions, the Court is tasked with assessing the written assignment instrument, and thus deciding whether Hirsch has standing to sue Qingdao and the Doran defendants.

As set forth below, the Court concludes that the assignment did not transfer to Hirsch the claims against the parties upon which he now sues, and that Hirsch therefore lacks standing. Accordingly, the Qingdao and Doran defendants' motions are granted and the complaint is dismissed against them. Furthermore, for the reasons stated herein, all claims against the two remaining (non-appearing) defendants, Michael Witthoft and Five Star Enterprises Limited, are also dismissed.

## BACKGROUND[2]

### I.    Hirsch's Allegations

Franklin was an American corporation that designed, manufactured, and sold cooling units. Hirsch was its principal. Franklin employed Doran, its Vice President of Sales and Marketing, from 1999 to 2009. Five Star Enterprises Limited ("Five Star") is a Hong Kong company that Franklin hired to perform quality control at the Chinese factories that manufactured Franklin's products. Michael Witthoft ("Witthoft") was Managing Director of Five Star.[3] (Doc. No. 1 at 2–6.)

In 2009, Doran and Witthoft partnered to form Orien, an American company incorporated in Virginia, which competed with Franklin in the cooling-unit industry. (*Id.* at 6.) Hirsch claims in his complaint that Doran, Witthoft, Orien, and Five Star ("the competing

---

[2] At this stage, the Court's review is limited to facts stated on the face of the complaint, facts found in documents incorporated by reference in the complaint or integral to the claims alleged, and matters of which the Court may take judicial notice. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). Here, the Court relies on the parties' initial assignment – which Hirsch expressly references in his complaint, (Doc. No. 1 at 3) – as well as other documents and minutes directly pertaining to, considered part of, that assignment.

[3] As addressed below, Five Star and Witthoft have not been served or appeared in this lawsuit.

defendants") misappropriated Franklin's manufacturing specifications, owners' manuals, service manuals, and supplier lists, (*id.* at 7–12), and should be held liable for misappropriation of confidential and propriety information and property, (*id.* at 15–16), unjust enrichment, (*id.* at 16–17), and unfair competition  (*id.* at 17).

Qingdao is a Chinese company that manufactures cooling units.  In 2006, Qingdao contracted with Franklin to produce cooling units for Franklin to market and sell in the United States.  This relationship lasted from 2006 to 2009, with the "majority" of those units allegedly proving to be defective and requiring substantial repairs.  (*Id.* at 4, 12.)  Qingdao failed to replace those units or to reimburse Franklin for the repairs, and Hirsch claims in his complaint that Qingdao is therefore liable for breach of contract, breach of express warranty, and breach of implied warranty of merchantability.  (*Id.* at 12–15.)[4]

## II.    *The Bankruptcy Proceedings and the First Assignment*

On September 11, 2009, Hirsch, on behalf of Franklin, filed a voluntary Chapter 11 bankruptcy petition.  On October 8, 2009, the case was converted to a bankruptcy under Chapter 7, and the Bankruptcy Court appointed Debra Kramer as trustee for the bankruptcy debtor's estate ("the Trustee").  (*Id.* at 2–3.)  By stipulation signed by attorneys for Hirsch and the Trustee, dated July 12, 2011, the Trustee agreed to assign certain claims from the debtor's estate to Hirsch.

At the outset, the assignment instrument broadly defines "Causes of Action" to include, *inter alia*, actions, causes of action, and claims.[5]  The instrument then further defined two

---

[4] Hirsch contends that Qingdao was formerly known as "Aucma," (Doc. No. 1 at 4), an allegation that Qingdao disputes.  That factual question is immaterial to the Court's resolution of the instant motions.

[5] Specifically, the assignment defined "Cause of Action" as comprising:

different "claims" against two Chinese companies that were being assigned to Hirsch. Those claims were against Henan Xinfei Electronics, Ltd., and Quingdao Orien Commercial Equipment Co., Ltd., along with each company's "affiliates, successors, predecessors, and assigns." The assignment identified those claims as the "Henan Claim" and the "Quingdao Claim," and collectively as the "Claims."

The Henan Claim referred to a "Cause of Action for alleged damages in the estimated amount of $1.5 million, against Henan Sinfei Electronics, Ltd. . . . and any of its affiliates, successors, predecessors and assigns, including Henan's parent company, Hong Leong Asia Ltd., a Singapore entity . . . resulting from defective products allegedly produced by Henan and purchased by the Debtor prepetition (the '**Henan Claim**')."[6] (First Stip. (Doc. No. 38-1) at 34 (ECF pagination).) The Quingdao Claim referred to:

> A Cause of Action for alleged damages against Quingdao Orien Commercial Equipment Co., Ltd., formerly known as Aucma, a company incorporated under the laws of the People's Republic of China, and any of its affiliates, successors, predecessors or assigns (collectively, "**Quingdao**"), relating to product liability issues as well as claims relating to the alleged theft of the Debtor's proprietary information, such as customer lists, product literature, care and use manuals, solicitation of former employees and direct sales to the Debtor's customers (the "**Quingdao Claim**" and together with the Henan Claim, the "**Claims**").

(*Id.* at 34–35.) (bold in original)

---

> actions, causes of action, liabilities, obligations, suits, debts, remedies, defenses, offsets, indebtedness (for borrowed money or in the nature of a guarantee), dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, rights, executions, claims . . . , objections to claims, judgments and demands whatsoever, whether known or unknown, choate or inchoate, existing or hereafter arising, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, in law, equity or otherwise against certain persons.

(Doc. No. 38-2 at 15.)

[6] All bold font contained herein is contained in the original documents.

The stipulation stated that the Trustee, in the exercise of her business judgment, determined that the bankruptcy estate would have to spend significant funds to pursue the Claims without any guarantee of success, and that Hirsch had expressed an interest in "purchasing and pursuing the Claims." (*Id.* at 35.) Consequently, the Trustee, "by and through her counsel," had "negotiated" the transfer of the Claims in exchange for "good and valuable consideration." Per the stipulation, the Trustee "absolutely and unconditionally sells, transfers and assigns to Hirsch . . . as of the date this Stipulation is approved by the [Bankruptcy] Court, all of the Trustee's right, title and interest in and to the Claims against Henan and Quingdao." (*Id.*) The stipulation further enumerated percentages of any recovery that the Trustee would receive from Hirsch as consideration for the assignment – namely, twenty percent for the Henan Claim and ten percent for the Qingdao Claim. (*Id.* at 36.)

The stipulation also contained an "integration" or "merger" clause. The parties agreed that the document "constitute[d] the[ir] entire agreement . . . with respect to the transaction contemplated herein, and supersede[d] all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Stipulation." (*Id.* at 38.) The parties further agreed that their rights thereunder would be "governed by and interpreted and determined in accordance with the laws of the State of New York." (*Id.*)

In a motion to the Bankruptcy Court dated August 19, 2011 (styled a motion seeking approval of a stipulation "regarding the assignment of the estate's claim against certain foreign entities"), the Trustee sought approval of the assignment as against Henan and Qingdao. (First Mot. to Approve Stip. (Doc. No. 38-1) at 41 (ECF pagination).) That motion mirrored the stipulation in all material respects, although the Trustee additionally noted that the stipulation

was the result of an "arms' length negotiations" between attorneys for the Trustee and Hirsch. (*Id.* at 43.) And, in explaining why the assignment was in the Trustee's sound business judgment, the Trustee stated that the effort of the debtor's estate to pursue the claims would be an "expensive and potentially lengthy endeavor given the nature of the Claims and the fact that Henan and Quingdao are foreign entities based in China and Singapore." (*Id.* at 46.)

On September 22, 2011, the Trustee and Hirsch appeared through counsel before the Bankruptcy Judge, the Honorable Jerome Feller. The Trustee advised Judge Feller that the parties were seeking approval of a stipulation "with respect to the assignment of two claims that the estate has against two Chinese entities." (9/22/01 Minutes (Doc. No. 38-2) at 5 (ECF pagination).) The Trustee noted that those two claims "stem[med]" from "alleged product defaults with respect to the debtor's business," that no lawsuits had been commenced against either company, and that Hirsch was in the process of obtaining documents and reviewing claims. (*Id.* at 6–8.) The Bankruptcy Court concluded that it was a reasonable business judgment for the Trustee to assign the Claims, thereby authorizing the Trustee to transfer "these two claims" pursuant to the terms of the stipulation. (*Id.* at 8.)

One week later, on September 27, 2011, Judge Feller issued a one-page order approving the stipulation assigning the claims against Henan, Qingdao, and any of their affiliates, successors, predecessors, and assigns. The order expressly encompassed the "record" of the "hearing" on September 22nd, and provided that, pursuant to Bankruptcy Code § 363(b)(1), the Trustee was authorized to sell, transfer, and assign "the Claims against Henan and Quingdao to

Hirsch or his designee or successors and assigns in accordance with the terms of the Stipulation." (9/27/11 Order (Doc. No. 38-1) at 48–49 (ECF pagination).)[7]

III.   *Hirsch's Filing of the Complaint*

On February 28, 2012, Hirsch filed this diversity action in the Eastern District of New York; the case was originally assigned to the Honorable Leonard D. Wexler in the Central Islip Division. Hirsch served process on Qingdao, Orien, and Doran, who filed notices of appearance. (Doc. Nos. 2, 15–16.) Hirsch has not provided proof of timely service as to Witthoft or Five Star, who have not appeared in this action to date.

On April 30, 2012, Orien and Doran requested a pre-motion conference before Judge Wexler to address their proposed motion to dismiss under Rule 12(b)(1), on the basis that the assignment did not transfer to Hirsch any causes of action against them, and that Hirsch therefore lacked standing to sue. (Doc. No. 4.) Following a conference on May 30, 2012, Judge Wexler granted the Doran defendants' request. That motion was fully briefed on August 20, 2012. (Doc. Nos. 12–14.)

On December 12, 2012, Judge Wexler ordered that the case be reassigned to the Brooklyn Division of the Eastern District of New York, denying the Doran defendants' pending motion to dismiss without prejudice to being raised anew before the next judge. The case was then randomly reassigned to the undersigned. Motions to dismiss of all three appearing defendants – Orien and Doran jointly, and Qingdao separately – were fully briefed on March 4, 2014.[8]

---

[7] The order noted that capitalized terms not otherwise defined – namely, "Claims" – had the meaning ascribed to them in the Trustee's motion, (*id.*), which, in turn, contained the definition provided in the underlying stipulation. (Doc. No. 38-1 at 34.)

[8] On August 15, 2013, this Court held a pre-motion conference to consider the requests of the three appearing defendants for leave to file dismissal motions. Following that conference, I ordered supplemental briefing on

*The Second Assignment*

Meanwhile, on July 25, 2012 – in between the pre-motion conference before Judge Wexler on May 30, 2012, and the completion of the Doran defendants' briefing of their motion to dismiss before Judge Wexler on August 20, 2012 – the Trustee and Hirsch executed a second stipulation.  That new stipulation purported to supplement and clarify the original assignment, stating, among other things, that the debtor's "products liability" causes of action encompassed alleged "breach of contract, breach of express warranty, breach of implied warranty of merchantability, unjust enrichment, account stated and damages relating to product liability issues."  (Second Stip. (Doc. No. 38-2) at 15 (ECF pagination).)[9]  The second stipulation also named, for the first time, additional parties against whom the debtor's estate held these claims, specifically, Orien, Doran, Witthoft, and Five Star, along with any of their affiliates, successors, predecessors, or assigns.  (*Id.* at 16.)  This second stipulation indicated that nothing contained therein "shall supercede [sic], amend or modify any aspect" of the first stipulation, which "shall remain in full force and effect."  (*Id.* at 19.)

By motion dated August 29, 2012, the Trustee moved for the Bankruptcy Court to approve the second stipulation.  The Trustee stated that, by virtue of the first assignment, she had transferred to Hirsch certain causes of action against Henan and "Quingdao," that Hirsch had since filed a complaint in the Eastern District, and that the Doran defendants were moving to

---

whether the assignment had to be construed pursuant to contract law, or whether the Court – even absent ambiguity in the assignment – could look beyond the four corners of the assignment instrument in construing its scope.  (*See* 8/15/13 Minutes (Doc. No. 32-2).)  I then set a briefing schedule for defendants' proposed Rule 12(b) motions, as noted in the text.

[9] In addition to products liability, the parties to the second stipulation noted that the debtor's estate also held causes of action for "alleged misappropriation of confidential and proprietary information and property, unjust enrichment and unfair competition and damages relating to the alleged theft of the Debtor's proprietary information, such as customer lists, product literature, care and use manuals, solicitation of former employees and direct sales to the Debtor's customers (collectively, the '**Theft of Proprietary Information Causes of Action**')."  (*Id.* at 5.)

dismiss that complaint. The Trustee stated, in a conclusory fashion, that she disagreed with the argument underpinning the Doran defendants' motion to dismiss – *i.e.*, that the first stipulation failed to assign to Hirsch any causes of action against Doran and Orien. Nonetheless, "in an abundance of caution and to clear any ambiguity that may exist with respect to the First Assignment," the Trustee was seeking approval of that second assignment. (Second Mot. to Approve Stip. (Doc. No. 38-2) at 27–28 (ECF pagination).)

On September 25, 2012, counsel for the Trustee appeared before Judge Feller, who so-ordered the second stipulation. (9/25/12 Minutes (Doc. No. 38-2) at 39–41 (ECF pagination).) That ruling was memorialized in a written order dated September 28, 2012. (9/28/12 Order (Doc. No. 38-2) at 33–34 (ECF pagination).)

Following the commencement of motion practice before the undersigned, the Trustee and Hirsch executed a *third* stipulation, which the Bankruptcy Court – the Honorable Carla E. Craig – so-ordered on May 9, 2014. That most recent stipulation sought to further "clarify" the "intent of the parties to the First Assignment and Second Assignment," and provided for the transfer of, among other things, "[a]ny and all claims and causes of action arising out of the business relationships between and among the parties to the Qingdao Action." (09-BR-47870, Doc. No. 72 at 3.)

## THE PARTIES' POSITIONS

As relevant to the operative issues before the Court, the Doran defendants argue that, pursuant to the plain meaning of the first stipulation, the Trustee did not assign any causes of action to Hirsch as against them. The Doran defendants contend that the Court is precluded from considering the second stipulated assignment in interpreting the language and scope of the first assignment, since the parties did not enter into that second stipulation until after Hirsch filed this

lawsuit.  Hence, the Doran defendants continue, Hirsch lacks standing to sue them.  (*See* Doran's and Orien's Mem. of Law in Supp. of Mot. to Dism. (Doc. No. 37-3).)

Qingdao, conversely, recognizes that it was one of the named parties against whom claims were transferred to Hirsch in the original stipulation.  But Qingdao contends that, under the plain meaning of that unambiguous first assignment, the Trustee assigned claims sounding *exclusively* in products liability and proprietary theft.  Qingdao maintains that Hirsch's complaint, which asserts causes of action against Qingdao only for breach of contract and warranty, falls outside the scope of that assignment, and that Hirsch consequently lacks standing to sue Qingdao for those claims.  (*See* Qingdao's Mem. of Law in Supp. of Mot. to Dism. (Doc. No. 40-1).)

In response, Hirsch argues that the Court should construe the first stipulation broadly as assigning all of the relevant claims against these three particular defendants.  At the very least, Hirsch posits, the language of the original stipulation is ambiguous, and the Court should clarify that ambiguity by considering the second stipulation as evidence of the contracting parties' intent.  (*See* Hirsch's Mem. of Law in Opp'n to Motions to Dism. (Doc. Nos. 38-6, 41).)

For the reasons that follow, the Court finds that defendants' arguments have merit, that Hirsch lacked the requisite standing to sue at the time that he filed this lawsuit, and that, consequently, this Court is without subject matter jurisdiction over Hirsch's claims against the moving defendants.

## DISCUSSION

I.    *Threshold Issue of Whether to Consider the Second Stipulation*

At the outset, the Court must decide whether it can properly consider the second stipulated assignment in determining Hirsch's standing or lack thereof.  The Trustee and Hirsch

executed the second stipulation long after Hirsch had filed his complaint in this action – in fact, they entered into that new stipulation after the Doran defendants had already moved before Judge Wexler to dismiss for lack of standing. Insofar as the first stipulation seemingly conveyed only a limited number of claims against two particular parties – a matter discussed in depth below – the second assignment purports to clarify that the Trustee and Hirsch intended to transfer many more causes of action against a number of additional parties. Consequently, Hirsch maintains, if the Court were to rely upon the second stipulation in construing the scope of the first assignment, the issues related to standing would certainly be quite different. But the Court's ability to consider the second assignment is constrained by the intersection of two sets of legal rules, and leads the Court to reject Hirsch's arguments.

## A.    The Law of Standing

The Court is bound first by certain elements of the standing doctrine itself. To that end, Article III of the Constitution limits the jurisdiction of this Court "to the resolution of 'cases' and 'controversies.'" *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009). "[W]hether the plaintiff has made out a 'case or controversy' between himself and the defendant . . . is the threshold question in every federal case, determining the power of the court to entertain the suit." *Id.* To satisfy the "'irreducible constitutional minimum' of standing," a plaintiff must establish, among other factors, "a personal injury in fact." *Mahon*, 683 F.3d at 62; *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 228 (2d Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).[10] "[T]he minimum requirement for an injury-in-fact is that the plaintiff

_____

[10] Article III standing is a jurisdictional requirement that the Court must address before considering any other issues. *See Vasconcellos v. City of New York*, No. 12-CV-8445 (CM), 2014 WL 4961441, at *3 (S.D.N.Y. Oct. 2, 2014) (citing *Official Comm. of Unsecured Creditors of Color Title, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 156

have legal title to, or a proprietary interest in, the claim." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008). Absent such legal title or proprietary interest, a litigant lacks a "legally-protected interest," and therefore has no standing. *In re: Century/ML Cable Venture*, 311 F. App'x 455 (2d Cir. 2009).

If an instrument that purports to assign a right or legal claim is void or otherwise insufficient, a plaintiff is necessarily without a legally-protected interest therein. A complaint predicated on such a defective assignment must be dismissed for lack of standing. *See, e.g.*, *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 779–80 (D.C. Cir. 1996) (reversing due to lack of standing where the plaintiff did not receive ownership of patents via assignment until *after* filing lawsuit, and holding that the plaintiff could not evade that result by executing an agreement to make the assignment *nunc pro tunc*: "This agreement is not sufficient to confer standing on Gaia retroactively"); *Brazell*, 2010 WL 3377452, at *4–6 (dismissing complaint because a "void assignment cannot confer standing on the purported assignee"); *Bernstein v. Greater New York Mutual Insurance Company*, 706 F. Supp. 287, 290 (S.D.N.Y. 1989) ("Ambassador does not have standing to bring this action against GNY because it cannot secure by assignment Grant's right to sue GNY for first party benefits, and does not stand in a close enough relationship to Grant to proceed with an assignment.").

---

(2d Cir. 2003)). Hirsch claims that defendants are conflating the concepts of standing and subject matter jurisdiction, and improperly moving to dismiss the complaint under Rule 12(b)(1). (Doc. No. 38-6 at 13–14; Doc. No. 41 at 13–14.) Hirsch is incorrect. Article III standing is a limitation on the authority of a federal court to exercise subject matter jurisdiction, and defendants' motions are thus properly brought pursuant to Rule 12(b)(1). *See Mahon*, 683 F.3d at 62 ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim.") (quotations and citation omitted); *Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim."); *Pelican Equity LLC v. Brazell*, 09-CV-5927 (NRB), 2010 WL 3377452, at *1, *6 (S.D.N.Y. Aug. 17, 2010) ("It follows that plaintiff lacks standing, this Court lacks subject matter jurisdiction, and the case must be dismissed. . . . [S]tanding is not a 'get out of jail free card' for a party sued, but a threshold jurisdictional requirement.").

Critically for present purposes, standing must exist at the *inception* of a lawsuit. *See Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994) (standing is "assessed as of the time the lawsuit is brought") (citing, *inter alia*, *Lujan*, 504 U.S. at 571 n.4); *New York Bankers Assoc., Inc. v. City of New York*, No. 13-CV-7212 (KPF), 2014 WL 4435427, at *9 (S.D.N.Y. Sept. 9, 2014) (citing *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993)); 15 MOORE'S FEDERAL PRACTICE § 101.32 (3d ed. 2013) ("Standing is determined as of the time suit is filed."); *see also Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570–71 (2004) ("This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure.") (footnote omitted); *Mollan v. Torrance*, 9 Wheat. 537, 539 (1824).[11]

## B.     The Law of Contracts

Beyond standing, the Court is also circumscribed by tenets of New York contract law.[12] The stipulation between the Trustee and Hirsch is indisputably a contract, embodying an agreement to transfer rights in exchange for valuable consideration. (*See* Doc. No. 38-1 at 35.) "[S]tipulations and orders are binding agreements, that are enforceable just as contracts are." *Hoblock v. Albany County Bd. of Elections*, 488 F. Supp. 2d 163, 165–66 (N.D.N.Y. 2006); *see Neirbo Co. et al. v. Bethlehem Shipbuilding Corp., Ltd.*, 308 U.S. 165, 175 (1939) (quoting Cardozo, J. that "a stipulation is a true contract," as stated in *Bagdon v. Philadelphia & Reading*

---

[11] Although there are narrow exceptions to the requirement that standing exist at the start of a lawsuit, for example, one that allows federal courts to address class certification prior to standing in cases where the certification issue is "logically antecedent to Article III concerns," *Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 451–52 (S.D.N.Y. 2010) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)), no exception reasonably applies in the case at hand.

[12] The Court applies New York law, which all parties have agreed is applicable in this diversity action. *See Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000) (applying New York law to diversity action where parties agreed that New York law governed litigation); *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 n.5 (2d Cir. 1998) ("Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state. It is therefore appropriate for this Court to apply New York law.").

*C. & I. Co.*, 217 N.Y. 432, 436–37 (1916)); *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989) (noting that a stipulation is akin to a contract). That the stipulation became effective only upon judicial approval does not lessen this conclusion. *See Stein and Day Inc. v. Coordinated Systems and Services Corp.*, 83 B.R. 221, 226 (Bankr. S.D.N.Y. 1988) (noting that a so-ordered stipulation "has a double aspect both as a contract and as a court order") (citations omitted).

"[T]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent," and that the "best evidence of what parties to a written agreement intend is what they say in their writing." *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008) (quotations and citation omitted). As a result, "[w]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)) (quotations omitted). To be sure, if a written agreement is "ambiguous," the parole evidence rule allows for the consideration of extrinsic evidence to shed light on the parties' underlying intent. *See, e.g.*, *State of New York v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985). "Ambiguity is found when the contract language suggests 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *4Kids Entertainment, Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 245–46 (E.D.N.Y. 2011) (quoting *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998)).

But, absent ambiguity – that is, "where there is no reasonable basis for a difference of opinion," *Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 423 (2d Cir.

1998) – a court must stay within the four corners of the document. *See id.*; *Investors Ins. Co. of America v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir. 1990); *Onewest Bank, FSB v. Joam LLC*, No. 10-CV-1063 (JG), 2011 WL 6967635, at *6 (E.D.N.Y. July 26, 2011) (noting that "extrinsic evidence is excluded from consideration in the interpretation of an unambiguous assignment"); *Neuman v. Blue Cross/Blue Shield of Greater New York*, 55 B.R. 702, 705 (S.D.N.Y. 1985) (stating that a "stipulation is a contract between parties," is "subject to the general principals [sic] governing the construction of a contract," and "should be interpreted within the four corners of the document"). In other words, when the terms of an agreement are unambiguous, a court is obligated to enforce the language as written, and must avoid the temptation to "make a new contract for the parties under the guise of interpreting the writing." *Morlee Sales Corp. v. Manufacturers Trust Co.*, 9 N.Y.2d 16, 19 (1961) (quotations omitted).[13]

When, as here, an agreement includes a merger or integration clause – which memorializes the parties' specific intent to foreclose consideration of extrinsic evidence in construing the contract – the need for a court to confine itself to the four corners of the document is only heightened. *See Dorinco*, 917 F.2d at 104 (preclusion from introducing extrinsic evidence "particularly appropriate given the Agreement's 'integration clause,' which provides that the Agreement represents the entire understanding of the parties to the transaction"); *Dujardin v. Liberty Media Corporation*, 359 F. Supp. 2d 337, 356 (S.D.N.Y. 2005) ("It is generally understood that the purpose of an integration clause is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.") (quoting *Primex Int'l Corp. v. Wal-Mart Stores*, 89 N.Y.2d 594, 600

---

[13] The interpretation of an unambiguous assignment is an issue of law and may be properly considered on a motion to dismiss. *See Onewest Bank*, 2011 WL 6967635, at *5 (citing *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

(1997)) (quotations omitted); *Benjamin Goldstein Prods. v. Fish*, 603 N.Y.S.2d 849 (N.Y. App. Div. 1st Dep't 1993) ("The court properly found that parol evidence was barred by the merger clause.").

### C.    Effect of the Second Stipulation

Viewed through the overlapping prisms of these guiding principles, the Court is foreclosed from considering the second stipulation in interpreting the original stipulated assignment. First, there is simply nothing ambiguous or unclear about the terms of the first stipulation. That document transferred claims to Hirsch against only two specific companies and their affiliates, successors, predecessors, or assigns: Henan and Qingdao. (Doc. No. 32-3 at 3–4.) As to Qingdao, the parties agreed to the conveyance of only two particular causes of action: claims sounding in "products liability,"[14] and claims relating to the "alleged theft of the Debtor's proprietary information," such as "customer lists, product literature, care and use manuals, solicitation of former employees and direct sales to the Debtor's customers." (*Id.* at 3–4.) The stipulation contains a merger or integration clause, thereby underscoring that the agreement should be understood without reference to extrinsic evidence. Put differently, the stipulation means what it says, and nothing more. *See Dorinco*, 917 F.2d at 104.

Of course, the stipulated assignment, by its own terms, was not effective until approved by the Bankruptcy Court, which held that the assignment encompassed not only the stipulation, but also the Trustee's motion seeking approval thereof, the minutes of the hearing on that motion, and the Bankruptcy Court's written order. Those materials are therefore treated as part of the assignment. *See Onewest*, 2011 WL 6967635, at *6 ("Although extrinsic evidence is excluded from consideration in the interpretation of an unambiguous assignment, the mortgage

---

[14] The plain meaning of "products liability" is revisited in the text *infra*.

documents at issue may be considered part of the same assignment, and to the extent those documents show an intent to transfer ancillary claims, plaintiffs may have standing."). Yet, as discussed further *infra*, those supplemental materials, described in detail above, do not create ambiguity in the terms of the original assignment, and thus provide no basis to consult extrinsic evidence.

However, even if there were ambiguity in the first assignment, the second stipulation still could not properly be considered as extrinsic evidence of the parties' putative intent. That is because the Trustee and Hirsch did not execute the second stipulation until long after Hirsch filed this lawsuit. Indeed, in seeking judicial approval of the second stipulation, the Trustee specifically acknowledged that its purpose was to clarify any perceived ambiguity in the original assignment in light of the Doran defendants' then-pending motion to dismiss the complaint for lack of standing. (*See* Doc. No. 38-2 at 28 ("Defendants Doran and [Orien] believe that the [First] Assignment did not include the Debtor's Causes of Action as to them. . . . . Although the Trustee does not agree with Defendants Doran and [Orien] in their assertion that the First Assignment did not include the Causes of Action as to them," the parties agreed to the second stipulation "in an abundance of caution and to clear any ambiguity that may exist with respect to the First Assignment").)

Based on the axiomatic standing principles set forth above, the Court could not rely upon extrinsic evidence that, while purporting to elucidate the parties' intent upon executing the stipulated assignment, was not created until *after* Hirsch brought this lawsuit. That is to say, Hirsch cannot manufacture standing retroactively if none existed when he commenced this action, and thus even if this Court could consider evidence outside the original assignment, the second stipulation would be off-limits. *See, e.g.*, *Lujan*, 504 U.S. at 571 n.4; *Minneapolis & St.*

*Louis R.R. v. Peoria & Pekin Union Ry. Co.*, 270 U.S. 580, 586 (1926) ("The [subject matter] jurisdiction of the lower court depends upon the state of things existing at the time the suit is brought."); *In re Adelphia Communications Corp. Securities and Derivative Litigation*, No. 03-MDL-1529 (LMM), 2011 WL 6434009, at *5 (S.D.N.Y. Dec. 21, 2011) ("The relevant date for measuring whether a plaintiff has standing is the date on which the suit commenced.") (quoting *Mayer v. Wing*, 922 F. Supp. 902, 906 (S.D.N.Y. 1996), which, in turn, cited *United States Parole Comm'n v. Geraghty*, 455 U.S. 388, 397 (1980)); *see also Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998) ("*nunc pro tunc* assignments are not sufficient to confer retroactive standing").[15]

## II.   Claims Against Orien and Doran (The Doran Defendants)

Guided by these considerations, Hirsch's complaint against the Doran defendants must be dismissed for lack of standing. As stated, the plain language of the first assignment conveys to Hirsch claims solely concerning Henan and Qingdao. This assignment does not purport, in any manner, to transfer claims against the Doran defendants from the debtor's estate to Hirsch, much less claims sounding specifically in theft of proprietary information. Nor do the supplemental

---

[15] In his post-conference letter brief before the undersigned, Hirsch referred indirectly to New York's mutual mistake doctrine, which provides that a contract can be rescinded or reformed if a mutual mistake exists at the time of the contract's execution that is "so material that . . . it goes to the foundation of the agreement" and "vitally affect[s] the basis upon which the parties contract[ed]." *Simkin v. Blank*, 19 N.Y.2d 46, 52 (2012) (quotations and citations omitted). Hirsch never directly argues that the stipulation should be reformed based on mutual mistake, but the Court nonetheless finds that the doctrine would not reasonably apply here. The fact that the original assignment's scope is not as robust as Hirsch claims that the parties intended (when now faced with Rule 12(b)(1) motions) falls short of satisfying the demanding standard that a mutual mistake "go[] to the foundation of the agreement." *See id.*; *see also Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 456 (S.D.N.Y. 2000) ("[I]t is hornbook law that parties cannot alter or contradict the express terms of one specific provision of an integrated contract in writing . . . by pointing to parole evidence of [fraud or mutual mistake], where the party . . . does not dispute other relevant provisions of the contract and in effect concedes their validity.") (quotations omitted). Moreover, even if this doctrine conceivably applied, the Court would have to consult the parties' expressions of intent in the *second* stipulated assignment to make that determination. Because the second stipulation is not contemporaneous evidence of the parties' intent undergirding the earlier stipulation, but rather a new agreement that the parties executed in the midst of this litigation, consideration of the second stipulation would be foreclosed by axiomatic standing principles.

materials from the bankruptcy record deemed part of the first assignment support that proposition, or create ambiguity regarding the identity of the parties against whom choses of action were conveyed. To the contrary, at the September 22, 2011 hearing before the Bankruptcy Court, counsel for the Trustee explicitly and unequivocally described the assignment as pertaining to the transfer of claims against two "Chinese entities." (Doc. No. 32-3 at 23.) Although Qingdao and Henan are Chinese companies, Orien is an American company incorporated in Virginia, and Doran is a person who resides in Virginia. (Doc. No. 1 at 4, 6.) Needless to say, neither Orien nor Doran is a "Chinese entity."[16]

Hirsch, nonetheless, characterizes this as a "tortured and extremely narrow reading" of the first assignment's language. (Doc. No. 38-6 at 1.)[17] While appearing to acknowledge that claims relating to "products liability issues" were assigned exclusively to Qingdao in the applicable "whereas" clause, Hirsch urges that the latter portion of that same clause – *i.e.*, "as well as claims relating to the alleged theft of the Debtor's proprietary information" – should be construed expansively to permit claims for proprietary theft against any and all potential defendants, including the Doran defendants. (*Id.* at 15, 17–18.)

However, the Court rejects Hirsch's interpretation, as it takes that contractual language completely out of context. As the Doran defendants correctly emphasize, (Doc. No. 37-3 at 15), the stipulation "classifies and assigns claims according to the potential defendant(s)," and insofar

---

[16] In response to the Doran defendants' request for a pre-motion conference before Judge Wexler, Hirsch claimed to have standing to sue the Doran defendants because they were "affiliated" with Qingdao. (Doc. No. 2.) Hirsch has since retreated from that position, which he does not raise in opposing the Doran defendants' dismissal motion.

[17] For ease of reference, the paragraph in question states in pertinent part, "**WHEREAS**, the Debtor also holds a Cause of Action for alleged damages against Qingdao Orien Commercial Equipment Co., Ltd., formerly known as Aucma, a company incorporated under the laws of the People's Republic of China, and any of its affiliates, successors, predecessors or assigns (collectively, '**Quingdao**'), relating to product liability issues as well as claims relating to the alleged theft of the Debtor's propriety information, such as customer lists, product literature, care and use manuals, solicitation of former employees and direct sales to the Debtor's customers (the '**Quingdao Claim**' and together with the Henan Claim, the '**Claims**')." (Doc. No. 32-3 at 3–4.)

as Hirsch received an assignment of the right to sue for claims sounding in theft of proprietary information, that right existed *solely* as against Qingdao. Hirsch's contrary reading would require the Court to bifurcate a single contractual clause – which expressly pertains to "Quingdao" and the "Quingdao Claim" – into one portion applicable to Quingdao (for "products liability" claims), and another portion applicable to *any* potential defendant (for theft of proprietary information claims). To read the stipulation in this fashion would be unreasonable. *See Belden-Stark Bridck Corp. v. Bronson & Popoli, Inc.*, 48 A.D.2d 845, 846 (N.Y. App. Div. 2d Dep't 1975) ("It is not for the courts to make new contracts between (the parties) or to give their express language a strained or unreasonable construction.") (quoting *Cream of Wheat Co. v. Arthur H. Crist Co.*, 222 N.Y. 487, 493–94 (1918)) (quotations omitted).[18]

Other elements of the first stipulation, as well as the supplemental materials deemed part of the assignment, reinforce the Court's conclusion. For example, the stipulation lists consideration – in the form of percentages of any sums recovered – that the debtor's estate would receive in exchange for agreeing to the assignment. The parties enumerated only two such percentages: twenty percent of any sums recovered for the claims against Henan, and ten percent of any sums recovered for the claims against Qingdao. (Doc. No. 32-3 at 4.) If the parties intended for the assignment of the misappropriation claim to include causes of action against *any* potential defendant, including the Doran defendants, they could have included a default percentage for the debtor's estate to receive from any sums that Hirsch recovered against such unnamed, prospective defendants. Manifestly, the absence of such a provision underscores that

---

[18] In a pre-motion letter before the undersigned, Hirsch made much of the fact that the first stipulation defined "Cause of Action" to include claims "foreseen or unforeseen, asserted or unasserted, in law, equity or otherwise against certain persons." (*See* Doc. No. 35 at 3–4.) Yet that emphasis was misplaced. After all, in the ensuing paragraphs of the stipulation, the Trustee and Hirsch narrowed both the prospective defendants against whom claims were being conveyed, as well as the particular nature of those claims subject to the assignment. Put another way, the "Claims" assigned are a subset of the "Causes of Action."

the assignment of theft-of-proprietary information claims was tethered uniquely to Qingdao. And, again, that notion is only cemented by the explicit recognition of the Trustee's attorney, in moving for Judge Feller's approval of the stipulation, that the assignment concerned the transfer of claims only against two "Chinese entities."  (Doc. No. 38-2 at 5.)

In short, the plain language of the first stipulation did not transfer to Hirsch any claims against Orien or Doran, and the Court is constrained from looking beyond the four corners of that unambiguous agreement.  Because Hirsch therefore lacked any interest in his causes of action against the Doran defendants upon filing this lawsuit, he did not have standing to sue those defendants.  Accordingly, the Doran defendants' motion to dismiss under Rule 12(b)(1) is granted.

III.    *Claims Against Qingdao*

It is undisputed that the first stipulation transferred causes of action to Hirsch against Qingdao.  But the plain meaning of that stipulation, which assigned only particular *kinds* of claims against Qingdao, poses yet another obstacle for Hirsch in his pursuit of the instant lawsuit.  To that end, the Trustee conveyed to Qingdao, as relevant here, claims sounding in "products liability" as well as claims relating to the theft of proprietary information.[19]  (Doc. No. 32-3 at 3.)  Hirsch, however, sues Qingdao for breach of contract, breach of express warranty, and breach of implied warranty of merchantability – causes of action for purely economic loss that Hirsch allegedly sustained due to Qingdao's alleged provision of defective goods.  (Doc. No. 1 at 12–15.)  Qingdao urges that contract and warranty claims are qualitatively different than

---

[19] Because the provision of defective goods obviously has nothing to do with the theft of proprietary information, the Court focuses on the products liability aspect of the assignment in its ensuing analysis.

products liability claims, and that, consequently, Hirsch lacks standing to sue Qingdao for breach of contract and warranty.  The Court agrees.

As commonly understood, an action in products liability concerns tort liability for *physical injury or property damage* sustained from defectively designed or manufactured goods. That plain meaning finds overwhelming support in an array of bedrock legal authorities.  *See* BLACK'S LAW DICTIONARY 1402 (10th ed. 2014) ("products liability, n. (1925) 1. A manufacturer's or seller's tort liability for any damages or injuries suffered by a buyer, user, or bystander as a result of a defective product."); *id.* ("products-liability action. (1960) A lawsuit brought against a manufacturer, seller, or lessor of a product – regardless of the substantive legal theory or theories on which the lawsuit is brought – for personal injury, death, or property damage caused by the manufacture, construction, design, formulation, installation, preparation, or assembly of a product."); AM. L. PROD. LIAB. 3d § 1:1, *'Products liability' defined* ("Products liability law broadly refers to the legal responsibility for injury resulting from the use of a product. . . . [T]he term 'products liability' typically covers any liability of a manufacturer or other distributor of a product where a personal injury or damage to some other property is caused by a defect in the product."); *id.* § 1:4, *Restatement Third, Torts: Product Liability* ("The basic liability section provides that one engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the product defect.").

The Supreme Court and the New York Court of Appeals, likewise, specifically distinguish between a products liability action to recover for physical injuries or property damage, and an action in contract or warranty to recover for purely economic damages.  *See East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872–75 (1986) (delineating

conceptually between, on the one hand, actions for economic damages sounding in contract and warranty, and, on the other hand, "products-liability law"); *see also id.* (finding that "injury to a product itself" is not protected by the law of products liability, and emphasizing that a contrary view "fails to account for the need to keep products liability and contract law in separate spheres"); *Bocre Leasing Corp. v. General Motors Corp. (Allison Gas Turbine Div.)*, 84 N.Y.2d 685, 693–94 (1995) (adopting the so-called "economic loss doctrine" propounded in *East River Steamship Corp*, *supra*).[20]

Here, the relevant language of conveyance was specific – referring only to "products liability" issues. That language was neither sweeping nor inclusive, nor did it provide merely examples or illustrations of the kinds of claims being assigned. When, as here, contract language "expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded." McKinney's Statutes § 240 (maxim of *expressio unius est exclusio alterius*); *see Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403–04 (1984) ("In considering this problem, guidance is provided by the doctrine of '*inclusio unius est exclusio alterius*,' an applicable maxim when interpreting contracts.") (citation omitted). The plain meaning of the stipulated assignment thus reflects the intention to restrict the transfer of claims to causes of action sounding in products liability – which, as explained, connotes an action based

---

[20] To be certain, the law of products liability and warranty can intersect, *see East River Steamship Corp.*, 476 U.S. at 837 n.8 ("We recognize, of course, that warranty and products liability are not static bodies of law and may overlap. . . . Nonetheless, the main currents of tort law run in different directions from those of contract and warranty, and the latter seem to us far more appropriate for commercial disputes of the kind involved here."), and a products liability action can theoretically be litigated under a breach-of-warranty theory. In other words, if a party received an assignment of a breach-of-warranty claim, that assignment could hypothetically embrace a claim for physical injury or property damage under the law of products liability. But that is the converse of the situation at hand. The assignment here transfers claims against Qingdao sounding in "products liability," yet Hirsch's causes of action against Qingdao in the complaint involve purely economic losses under contract or warranty.

on physical injury or property damage resulting from defective products. The stipulation did not assign to Hirsch causes of action for purely economic loss arising out of contract and warranty.[21]

The stipulation of assignment for the Henan claim buttresses this conclusion. *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("[W]e do not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by the contract as a whole."). As to Henan, the Trustee agreed to a distinctly broader transfer: the conveyance of a "Cause of Action for alleged damages . . . resulting from defective products allegedly produced by Henan and purchased by the Debtor prepetition." (Doc. No. 32-3 at 3.) The broader language of the Henan assignment, through the use of the term "defective products," reasonably encompassed claims sounding *both* in contract/warranty and products liability. Of course, the contracting parties could have effectuated an assignment of equal scope as against Qingdao by simply repeating that language in the "whereas" clause for the Qingdao assignment. But they did no such thing. As explained, the parties utilized narrower language that cabined the assignment only to "products liability" claims, thereby circumscribing the rights conveyed as against Qingdao in comparison to those as against Henan. The Court will not disregard this clear juxtaposition in the operative contract language. *See* McKinney's Statutes § 231 ("In the construction of a statute, meaning and effect should be given to all its language, if possible, and words are not to be rejected as superfluous when it is practicable to give to each a distinct and separate meaning."); *see also Madeira v. Affordable Hous. Found., Inc.*, 323 F. App'x 89, 91 (2d Cir. 2009) ("New York law clearly disfavors interpretations that render contract provisions meaningless or superfluous.") (quoting *Manley v. AmBase Corp.*, 337 F.3d 327, 250 (2d Cir. 2003)) (quotations omitted); *Republic of Rwanda v. Ferone*, 307 F. App'x 600, 602 (2d Cir.

---

[21] The Trustee and Hirsch could have easily agreed to assign to Hirsch *all* claims against Qingdao. Notably, that is precisely what the parties did in the third stipulation of assignment. (*See* 09-BK-47870, Doc No. 72 at 3–4.)

2009) ("Courts should construe a contract so as to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract.") (quotations and citation omitted).[22]

Hirsch's contrary argument is unconvincing. He insists that, although the assignment relating to Qingdao "sounds in products liability and theft of proprietary information, this language was not intended to preclude claims for breach of contract or breach of any express or implied warranties which arise out of the same facts." (Doc. No. 41 at 5–6.) Hirsch then cites, among other materials, his own declarations in support of his opposition to Qingdao's dismissal motions – both postdating his commencement of this lawsuit – in which he claimed that it was the contracting parties' intention to effect an expansive transfer of rights, notwithstanding the narrow language in the original stipulation. (*See id.* at 6 ("[T]he intent was to vest Plaintiff with Article III standing.").) The ostensible thrust of Hirsch's argument, then, is *not* that the plain meaning of "products liability" embraces contract and warranty actions.[23] Rather, Hirsch appears to be urging that, in light of the parties' clarification of their intent, the Court should interpret the absence of a provision in the stipulation affirmatively prohibiting the assignment of additional claims as evidence that the parties intended for the assignment to encompass any and

---

[22] Nothing in the supplemental materials deemed part of the first assignment calls into question the Court's conclusion. Although counsel for the Trustee commented at the September 22nd hearing that the assigned causes of action related to certain product "defaults," this neither enlarged the scope of the Qingdao assignment nor engendered any ambiguity in the underlying language of the stipulation. The Court notes that, in the context of the commercial relationship between Franklin and Qingdao, "products liability issues" could have been reasonably referring to, among other things, indemnification for Franklin's liability for physical injuries that users of the cooling units suffered, or property damage (to property other than the cooling units) that Franklin sustained as a result of manufacturing defects for which Qingdao was responsible. Such causes of action would have been transferred to Hirsch pursuant to the plain meaning of the stipulation. But claims for purely economic loss, sounding in contract and warranty, were not reasonably transferred via that language.

[23] It is telling that, even in the contracting parties' *second* stipulation, there is no suggestion that the plain meaning of "products liability" extends to contract or warranty actions. Rather, the parties create a term of art – "Products Liability Causes of Action" – which they define as encompassing, among other causes of action, breach of contract, breach of warranty, and "damages relating to product liability issues." (Doc. No. 26-1 at 5 (ECF pagination).) But there was no such term of art in the original, operative stipulation.

all claims beyond those actually stated in the stipulation – put simpler, that the stipulation assigned whatever was necessary to support Hirsch's standing to sue. (*See id.* ("What is clear is that the language of the contract, including the First Assignment, was not intended to limit the Plaintiff's standing to bring this lawsuit.").) To the extent that this is Hirsch's point, the Court decidedly rejects it pursuant to the governing precepts of contract interpretation and standing already propounded at length.[24]

In short, because the Court finds that, under the first assignment, Hirsch did not receive any claims against Qingdao sounding in breach of contract or warranty, Hirsch lacks standing to sue Qingdao for those causes of action. Qingdao's motion to dismiss under Rule 12(b)(1) is therefore granted, and the complaint against Qingdao is dismissed.[25]

IV.    *Five Star and Witthoft*

Far more than 120 days have now lapsed without Hirsch filing proof of service of process on defendants Five Star and Witthoft. Ordinarily, the Court would permit Hirsch to show cause as to why the Court should not *sua sponte* dismiss the complaint against those remaining defendants. *See* Fed. R. Civ. P. 4(m); *Lindsey vv. Butler*, No. 11-CV-9102 (ER), 2014 WL 4290367, at *10 (S.D.N.Y. Aug. 29, 2014) ("Rule 4(m) requires that a court provide notice to a

---

[24] It may be that the limitations in the first assignment were inadvertent and unwanted – that is, the byproduct of careless draftsmanship. But where an agreement is unambiguous, as here, the Court must interpret that agreement according to the parties' intent as expressed through its plain meaning. The Court notes that the stipulation in this case was the product of arms' length negotiations between attorneys for sophisticated parties in a commercial bankruptcy, which suggests that the parties meant what they wrote (at least at the time that they wrote it).

[25] Hirsch has not cross-moved to amend his complaint, nor would *sua sponte* granting leave to amend be appropriate. That is because a plaintiff cannot amend his complaint to create subject matter jurisdiction retroactively where none already exists over the original complaint. *See, e.g.*, *Pressroom Unions-Printers League Income Sec. Fund v. Cont'Z Assurance Co.*, 700 F.2d 889, 893–94 (2d Cir. 1983). With that said, the dismissal is not on the merits. *See Salvani v. ADVFN PLC*, No. 13-CV-7082 (ER), 2014 WL 4828101, at *4 (S.D.N.Y. Sept. 23, 2014) ("Unlike a dismissal under Rule 12(b)(6), a dismissal under Rule 12(b)(1) is not reflective of the merits of an action.") (relying on, *inter alia*, *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996)).

plaintiff before dismissing a claim *sua sponte* for failure to serve process.") (citing *Nagy v. Dwyer*, 507 F.3d 161, 164 (2d Cir. 2007)).

However, even if Five Star and Witthoft had been served, the complaint would be dismissed against them for the same reason that dismissal is warranted against the Doran defendants – namely, that the first assignment did not transfer any claims to Hirsch against those particular defendants, and that Hirsch thus lacked standing to sue them. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *New York Bankers Ass'n, Inc. v. City of New York*, 13-CV-7212 (KPF), 2014 WL 4435427, at *14 n.12 (S.D.N.Y. Sept. 9, 2014) ("[H]aving determined that Plaintiff lacks standing, pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, the Court must *sua sponte* dismiss the Complaint as to the City."); *see also Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 979 (2d Cir. 1975) ("The lack of jurisdiction is so fundamental a defect that the rule permits a judge to recognize it *sua sponte* at any time."). Thus, all claims against Five Star and Witthoft are dismissed.

**CONCLUSION**

The motions to dismiss the complaint pursuant to Rule 12(b)(1) of defendants Doran and Orien, (Doc. No. 37), and of defendant Qingdao, (Doc. No. 40), are hereby granted, and the complaint is dismissed as to those defendants based on plaintiff Hirsch's lack of standing.  For the reasons stated herein, all claims against Five Star and are also dismissed.

The Clerk of Court shall enter judgment accordingly, and close the case.

SO ORDERED.

*/s/  Roslynn R. Mauskopf*

Dated: Brooklyn, New York
      March 6, 2015

ROSLYNN R. MAUSKOPF
United States District Judge